<u>US v. Anthony Bickerton</u>
Government's Sentencing Submission

# EXHIBIT D

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) | |
| v. | ) | |
| ANTHONY "TONY" BICKERTON | ) | Case No. 10-803-MBB |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 15, 2009__ in the county of __Norfolk__ in the _____ District of __Massachusetts__, the defendant(s) violated:

*Code Section*  
Title 18, U.S.C. § 1001

*Offense Description*  
Making materially false statements and representations to the FBI when interviewed regarding a public corruption investigation.

This criminal complaint is based on these facts:

SEE Attached Affidavit of F.B.I. Special Agent David S. Bell which is incorporated herein by reference.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

David S. Bell, Special Agent, F.B.I.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __01/11/2010 @ 4:35pm__

_____
*Judge's signature*

City and state: __Boston, MA__

Marianne B. Bowler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT DAVID S. BELL

I, David S. Bell, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), an agency of the United States Department of Justice. I have been employed as a FBI Special Agent for more than six years. I am currently assigned to the Public Corruption/Civil Rights Squad of the Boston Division of the FBI. During this assignment, I have been involved in the investigation of public corruption and civil rights offenses which are violations of federal statutes within the jurisdiction of the FBI. As set forth below, I have personally participated in the investigation of **ANTHONY "TONY" BICKERTON ("BICKERTON")**, an individual who recently resigned from his position as a detective with the Stoughton, MA police department.

2. This affidavit is submitted in support of a criminal complaint charging **BICKERTON** with knowingly and willfully making material false statements and representations to FBI agents when interviewed on July 15, 2009, regarding an ongoing public corruption investigation. This affidavit summarizes a portion of an investigation into the criminal activities of **BICKERTON** and other members of the Stoughton, MA police department. Since this affidavit is being submitted for the limited purpose of establishing probable cause to believe that **BICKERTON** violated Title 18, United States Code, Section 1001, I have not included each and every fact known to me concerning this investigation. The facts set forth in this affidavit are based on my personal participation in this investigation and from a review of information provided to me by individuals associated with this investigation. A substantial portion of the evidence in this affidavit is based on consensual audio and video

recordings.

## BACKGROUND

3. In 1979, the Stoughton Police Department ("SPD") hired **BICKERTON** as a patrolman. **BICKERTON** worked as both a patrolman and a detective for the next thirty years before abruptly resigning on September 11, 2009, after FBI investigators recovered evidence from a number of **BICKERTON**'s close associates. In 2008, a cooperating witness ("**CW**") approached the FBI and described his criminal relationship with **BICKERTON** that spanned more than 10 years. **CW** has an extensive criminal record as a thief and drug offender and regularly worked for **BICKERTON** as an SPD informant. **CW** stated that, over the course of their relationship, **CW** has provided stolen merchandise to **BICKERTON** in the form of plasma televisions and laptop computers among other items. At the time of the 2008 interview, **CW** estimated that he had previously provided over $30,000 dollars worth of stolen electronics to **BICKERTON**. **CW** further stated that he had previously provided stolen retail store gift cards to **BICKERTON**. **CW** cultivated this relationship with **BICKERTON** because it was useful and helpful to **CW** to know a corrupt police officer - it greatly facilitated **CW**'s criminal activities. Because of this corrupt relationship with **BICKERTON**, **CW** gained free access to SPD headquarters and, on occasion, to law enforcement sensitive databases of the Criminal Justice Information Systems, National Criminal Information Center ("NCIC") and Registry of Motor Vehicle ("RMV").

## FACTS

4. On or about April 23, 2008, **CW** was instructed by the FBI to ask **BICKERTON** if he would agree to protect a shipment of stolen plasma televisions while they were transferred from

one vehicle to another. **CW** reported that **BICKERTON** agreed to the proposal and **BICKERTON** indicated that he knew people who were interested in purchasing the stolen televisions at a greatly reduced price. Based on this information, the FBI purchased four 40 inch, flat screen, high definition Samsung televisions for **CW** to provide to **BICKERTON** under the guise that the televisions were stolen.

5. Subsequently, **CW** supplied the four "stolen" televisions to three individuals at **BICKERTON'S** express direction. At various times during recorded telephone calls, **BICKERTON** told **CW** where to deliver the "stolen" televisions, when to deliver the televisions, and to whom. For instance, in a series of recorded telephone calls beginning on April 25, 2008, **BICKERTON** arranged for **CW** to deliver two of the purportedly stolen televisions to SPD Officer Lino Azul. In these conversations, **BICKERTON** expressed his preference for LG brand televisions, told **CW** the time and place to deliver the two televisions, instructed **CW** to keep a third television for **BICKERTON**'s daughter, and told **CW** what to say in case **CW** got stopped by a police officer. On April 28, 2008, pursuant to **BICKERTON'S** instructions, **CW** delivered two of the televisions, in their original boxes, to SPD Officer Lino Azul at the Portuguese Club located at 845 Washington Street, Stoughton, MA in exchange for $1,025.00 in cash, which was approximately half of the retail price. This transaction was video recorded. Lino Azul has recently resigned from the SPD and he has admitted to investigators that he suspected these televisions were stolen and that he obtained them with the assistance of **BICKERTON**.

6. In a series of telephone calls beginning on May 1, 2008, **CW** attempted to make

3

arrangements to deliver the third purportedly stolen television directly to **BICKERTON**. After **BICKERTON** turned down a number of meeting spots suggested by **CW**, **BICKERTON** told **CW,** "I just hate to pick it up in front of people I don't know." In another call, **BICKERTON** asked **CW** to drive to Stoughton and drop off the television in the back of **BICKERTON's** pickup but **CW** was unable to do so. On May 2, 2008, **BICKERTON** told **CW** that he was "stuck in court." Accordingly, **BICKERTON** asked **CW** to deliver the third television to an associate who resided in Stoughton, MA. In a flurry of calls on May 2, 2008, **BICKERTON** instructed **CW** where to deliver the television, how much he would pay **CW**, and where **BICKERTON** would leave the cash payment for **CW** to pick up. On May 2, 2008, pursuant to **BICKERTON'S** instructions, **CW** delivered a Samsung 40" flat screen television to **BICKERTON's** associate in Stoughton, MA in exchange for $400.00 in cash. Subsequently, during the course of this investigation, **BICKERTON's** associate has admitted to investigators that he received this television from **CW**, whom he met through **BICKERTON**.

7. On May 8, 2008, after selling **BICKERTON** the third television, CW told **BICKERTON** that he could get 3 to 5 more televisions. **BICKERTON** had the following recorded conversation with **CW**:

**BICKERTON**: Alright, um, let me know. Already got them sold.

**CW**: You've got 'em all sold if I get 'em?

**BICKERTON**: Um, I think so, but I gotta, I gotta step out of this. I don't want people to think I'm fuckin, fuckin doing stuff with stolen property, you know?

**CW**: I'll never say nothing to nobody and it stays between you and I, and you know I am behind you, right?

4

BICKERTON: Ya, but I can't have people on the other side know what I am doing so, I'll sell them but I'll probably, I'll maybe put it through somebody else, you know what I am saying?

CW: Oh ya, so that way they don't know, I hear ya, yup. No problem

8. On June 5, 2008, in a recorded telephone conversation, CW offered to sell BICKERTON another television in exchange for a share of the drugs BICKERTON had seized in a recent undercover drug operation. BICKERTON declined to purchase the television with drugs, but directed CW to sell the television to SPD Detective Arlindo Romeiro ("Romeiro"). In a subsequent telephone call on June 6, 2008, BICKERTON put Officer Romeiro on the telephone to talk with CW about obtaining a television from CW. Romeiro has recently resigned from the SPD and he is cooperating with federal authorities on this investigation.

9. In a series of recorded telephone calls on July 16, 2008, BICKERTON made arrangements with CW for the delivery of a pressure washer. BICKERTON specified his preference for a gas powered, 2600 PSI pressure washer. Further, BICKERTON arranged for CW to drop off the pressure washer in the bed of BICKERTON'S personal pickup truck which was parked in the SPD parking lot. In a separate recorded telephone conversation, CW told BICKERTON that he would go pick up the pressure washer, call BICKERTON, meet him at the SPD station and BICKERTON could tell CW "if it was safe" and then CW would place the washer in the back of BICKERTON'S truck. BICKERTON agreed. On July 17, 2008, while being observed by FBI agents, CW did in fact place a gas powered, 2600 PSI pressure washer, purchased by the FBI, into the bed of BICKERTON'S personal pickup truck in the parking lot of the SPD.

10. CW also informed the FBI that **BICKERTON** would run license plate information through RMV databases for CW in exchange for retail store gift cards. Accordingly, the FBI supplied CW with a list of license plates on August 13, 2008. On August 15, 2008, in a recorded conversation, CW asked **BICKERTON** if he (CW) supplied **BICKERTON** with an envelope containing four or five (license) plates "will you take care of it? I will pick it up from you tomorrow." **BICKERTON** agreed. In the same conversation **BICKERTON** asked CW to get him a "used" laptop. CW had previously explained to FBI agents that **BICKERTON** utilized the word "used" as a code word for "stolen." **BICKERTON** directed CW to "just throw it in the back of my truck."

11. In a recorded call on August 15, 2008, **BICKERTON** asked CW "what do you need those (RMV printouts) for?" CW explained that he would send the information to a contact in New York and "a few days later I'll have a Chase or Discover (credit card) and a few days after that I have, um, gift cards." CW then explained that, using the name, social security number and date of birth provided by **BICKERTON**, he (CW) could call up a credit card company and tell them he was being deployed to Iraq and he needed a credit card sent to him and the credit card company would overnight the credit card to him. Using this method, CW explained to **BICKERTON** that he once received a credit card with a $50,000 credit limit. After listening to CW's explanation of this identity fraud scheme, **BICKERTON** stated: "All right, I'll give you a call tomorrow."

12. In recorded telephone conversations with **BICKERTON** on August 19, 2008, August 25, 2008 and August 26, 2008, CW had further discussions with **BICKERTON** about obtaining RMV information. On or about August 27, 2008, **BICKERTON** met CW at the SPD station. In

an audio and video recorded conversation at the SPD station, **BICKERTON** explained to **CW** that he ran the license plates **CW** provided through the RMV database, but "only one of the five came back." **BICKERTON** wrote down the name, date of birth and address associated with one of the license plates and gave the slip of paper to **CW** at the SPD station. Subsequently, at the request of the FBI, the administrators of the state RMV database conducted an audit of their system to determine if the Massachusetts vehicle registrations provided to **BICKERTON** by **CW** were queried by the Stoughton Police Department. In fact, the results of the audit established that four Massachusetts vehicle registrations previously provided to **BICKERTON** by **CW** (from the FBI) were queried at an RMV terminal located in the SPD station on August 26, 2008.

13. During this same time period in August of 2008, **CW** informed **BICKERTON** that he had also offered former SPD Officer Lino Azul $1,000.00 worth of gift cards to run license plate numbers through RMV databases. Azul, who is now cooperating with federal authorities, declined **CW**'s offer and reported the incident to **BICKERTON**. According to Azul, instead of expressing concern about this apparent bribe attempt, former SPD Detective **BICKERTON** responded by telling former SPD Officer Azul that **CW** would pay $500 for running three license plates.

14. On July 15, 2009, FBI agents interviewed **BICKERTON** about various matters including his relationship with **CW**. When asked specifically if he had information about any SPD officer receiving televisions from **CW**, **BICKERTON** falsely stated no. When asked specifically if he had ever accepted building materials such as pressure washers from **CW**, **BICKERTON** falsely stated no. When asked specifically if he knew or had any information

about any SPD police officer who had accepted retail gift cards from **CW**, **BICKERTON** falsely stated no. When asked specifically if he had information about any SPD officer receiving anything of value from **CW**, **BICKERTON** falsely stated no. When asked specifically if he had ever provided the results of RMV queries to **CW**, **BICKERTON** falsely stated "if you are asking me if (**CW**) ever left the Stoughton Police Department with information for his personal use, the answer is no."

15. On September 1, 2009, FBI agents simultaneously went to the Portuguese Club located at 845 Washington Street, Stoughton, MA and the home of **BICKERTON's** daughter and son-in-law located in Plymouth, MA. While at the Portuguese Club, agents recovered two of the "stolen" Samsung 40 inch flat screen televisions and, while at the Plymouth home, agents also recovered another one of the "stolen" 40 inch Samsung flat screen televisions. On the same day these televisions were recovered, **BICKERTON** asked SPD Detective Arlindo Romeiro to take possession of the power washer **BICKERTON** had previously received from **CW**. Additionally, on September 22, 2009, the FBI interviewed **BICKERTON's** son-in-law in the presence of his attorney and he admitted that he obtained the television for $500 through the efforts of his father-in-law, **BICKERTON**.

16. On October 2, 2009, the FBI interviewed former SPD Officer Lino Azul in the presence of his attorney. Azul admitted receiving televisions from **CW** at the Portuguese Club and stated that "without a doubt" **BICKERTON** orchestrated **CW's** delivery of the televisions. Azul also stated that in addition to arranging for the purchase of televisions, **BICKERTON** twice arranged for Azul to purchase $1000 retail store gift cards from **CW** at half price ($500). Moreover, former SPD officer Lino Azul advised investigators that **BICKERTON** met with Azul after the

8

FBI interviewed **BICKERTON** in August of 2009. **BICKERTON** admitted to Azul that he had lied to the FBI during his interview. **BICKERTON** then urged Azul to also lie to the FBI if Azul was ever questioned by the FBI.

DAVID S. BELL
Federal Bureau of Investigation

Sworn and subscribed to before me at Boston, Massachusetts, this 11th day of January, 2010.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

9